Thank you. Please be seated. We'll now have this final argument today. It is case number 24-40277, Estevez v. Cantu. And we'll begin with Fregario for Cantu. May it please the Court, Counsel. My name is Charles Fregario, and along with Charles A. Fregario, we represent the City of Laredo Police Officers Guajardo and Cantu. In the brief amount of time that I just introduced myself, that is the exact same window, the ten-second window that my clients had to make a decision as to firing when they were in fear of death or serious bodily injury. This is a very short window, Your Honors, and the trial court, this is a qualified immunity case, there's two issues. Was there a constitutional violation, number one, and two, was it clearly established law that what they were doing violated the law under the circumstances? We are asserting qualified immunity under both prongs. We feel that we have met that standard under both. The trial court, analyzing the gram factors, the three gram factors, the severity of the crime, this was a high-speed pursuit for a two-hour time frame in the City of Laredo between 3 a.m. and 5 a.m. Toward the end, when the tires were finally spiked, it turned into a slower speed pursuit, but it was a pursuit where Mr. Estevez never gave up. He knew, we're talking about City of Laredo, police officers, lights and siren, border patrol agents, lights and siren, DPS troopers, our state troopers in Texas, the Department of Public Safety troopers, all chasing throughout the City of Laredo, through the expressway, going around in circles through different quadrants. And we know that the severity of the crime was that Mr. Estevez was convicted of aggravated assault on a border patrol agent for attempting to strike him when he was attempting to put out the spikes. There was also an attempt on a DPS trooper that was part of a plea bargain where... Is that shown on the video, the attempt to strike the officer putting out the spikes? I don't believe that's part of the record, Your Honor. That was, again, during a two-hour... I looked at a lot of videos, so I just don't remember. I think the video that is submitted to the court is the last video where one of my clients, which is Officer Cantu, used a pit maneuver, which he wasn't trained in, but was able to have... You mean he drives them off the road? Right. Okay, because I've seen that on the incident which we're here on takes place, because once the vehicle... Basically, we're now two hours into this. The vehicle's off. Officers Guajardo and Cantu get out of their vehicles. The vehicle's placed in reverse and slams into Officer Guajardo's patrol vehicle. That's the instance where he is placed in imminent fear of death, serious bodily injury. And then the 10 seconds is where it elapses. After that vehicle strike, the vehicle goes forward. Guajardo shoots his first triple shots. They triple shoot. And then the vehicle is at the fence. It's spinning its tires. There's dust. And he shoots three more times, and Cantu shoots the final three shots. The trial court granted qualified immunity for the first three of Officer Guajardo, but denied qualified immunity for the next six. And that's even a shorter timeframe, because then we're talking about the last seven seconds. I guess if you could respond to the... I understand. I know we have cases that sometimes divide up a volley of shots and say... Or maybe there was a dog bite case that said, well, for this part, you get qualified immunity. For this other part, you don't. So I know there's some cases that have done that, but if you could respond to the district court's reasons for treating the last six shots differently from the first three shots for qualified immunity purposes. Yes, Your Honor. One, and again, we're looking at does the suspect pose an immediate threat? I would believe he does. And I think the third aspect is where she held that whether the suspect was actively resisting, the vehicle went and struck a fence. And for the shots four through six, and then seven through nine, she felt the officers had other alternatives. And that's one of the objections we have. Looking at other options is Monday morning quarterbacking, even though she said she was not Monday morning quarterbacking. But wasn't there testimony from the officers that said by the time shots six through nine are fired, they knew he wasn't a threat? No, Your Honor. There was some testimony where they conceded he... I thought they conceded or they stated that they knew he wasn't backing up. They knew they didn't think he had a gun. I mean, there was something like that that the officers basically said that the district court pointed to, isn't there? There's something in the deposition of the record. What am I thinking of? I thought the officers said they knew he wasn't a threat. Well, the question was if indeed the vehicle wasn't moving, then he was no longer a threat. And the officers said yes. But on cross-examination... No, it was an if. Right. If, I'm sorry. If, yes. If. Correct. You're saying they didn't say, oh, yeah, we didn't think he was a threat, but we just kept shooting for fun? Exactly. Okay. No, they said they were... Both Guajardo and Cantu stated that he was always a threat to them, and that's why they continued to shoot. And here's what's ultimately, I think, ultimately important. They were also going to the truck at that point. I'm really looking at shots four through nine, I guess. Four through nine. But they're going to the truck at that point, which is not moving, right? I mean, based on the video. It's not moving, but the wheels are spinning and there's a cloud of dust. And this, it's literally similar to the case that we cited out of the Ninth Circuit, which is Williams versus Sparks, which had a vehicle that was also jammed and the wheels were spinning. And the court, in granting qualified immunity, said once the subject attempted to accelerate his vehicle, officers do not need to risk their safety by waiting to see if his attempt is successful or not. In other words, he had been a threat. He still is a threat. We don't know if those tires are going to catch or not. And if they do, then he's become a threat again, because once you have a suspect that's cornered, this suspect obviously never gave up, never showed any signs of giving up. He could have just turned the ignition off, but he kept... The wheels were spinning. Well, I guess one thing to me is this amount of time. You said since the first three were okay, it's seven seconds. That to me is not a really long time. And so what I'm wondering is, how does that fit like in the head of even a police officer who should be a little more able to handle things? They don't want to get killed. They don't want to get attacked. And so is seven seconds too long, in your view, for them to be going, oh, oh, oh, oh? No, you're right. I don't believe it is. One, it's a very short window. And two, the case that we said, the Supreme Court case, Plumhoff versus Ricard, that is very similar to this case as well. That case says that once the subject... And that was a case where there was 15 shots in 10 seconds. But once an officer is deemed to... He has recognized the threat and he's in imminent fear of death or serious bodily injury, the Plumhoff case says the officers can continue to shoot until the threat ceases. And that's why, in that case, he had 15 shots and there was a big issue. The qualified immunity was denied at the trial court and the court of appeals. But the Supreme Court held that no, once there is that imminent threat, the officer can continue to shoot. And that's what officers are trained to do, to keep shooting until the threat has ceased. And these officers did not feel that the threat had ceased, and that's why they continued shooting. You know, forgive me, I should have this case, the name on the tip of my tongue, but I thought our court also has a case about a car being boxed in by officers that's sort of swinging around and crashing into cars. Do we have... Dawes versus City of Dallas. Dawes, okay. Is that one relevant or is it discussed in the briefs? I don't remember. I just remember it was a car case. Dawes is a case where, in the City of Dallas, it was an apartment complex, and a husband and wife were asleep in a vehicle and was just parked. And the City of Dallas police officers ran the plates. They were suspicious. And they came around the car. The individuals inside the vehicle became frightened. They turned the vehicle in, reared into the patrol vehicles, and the officers then started shooting as the vehicle attempted to, again, maneuver outside of the window. It did not successfully extricate itself, but that's a case that is directly on point. Okay, I'll go read it. Do you recall, did the court recognize qualified immunity in that case or not? Yes, it did. Yes, it did. Okay. I'll need to review that one. And what's ultimately important about that case, it really goes to not only the no constitutional violation, but it goes to not clearly established. The court in that case specifically, in this case, if you remember, the trial court said that the clearly established law at the time was established by Lytle v. Bexar County. Dawes specifically says that Lytle cannot establish clearly established law because there was never a quote-unquote Fourth Amendment violation issued. So Dawes and Colburn... What were the facts in Lytle? Just remind me. Pardon? What were the facts in Lytle v. Bexar County? One of the facts that's a little very different is that now that we're in this age where everything's on body-worn camera, there wasn't any video on that particular case. But the holding in Lytle was that there was an officer, the officer's testimony was that he was within feet of shooting the suspect that was armed and had committed a felony. The suspect said he was weighed four houses down and with no other officer was in danger. The Lytle court said that if we believe, if the plaintiff, if the defendant officer's version of events were true, that he would have qualified immunity. If he was four houses down, then there's no reason to shoot. There was a fact. But it's not a Fourth Amendment violation. And the Dawes court was very implicit in this, going into the case that the only case that the trial court held that was clearly established that they cited in the Fifth Circuit was Lytle. And Dawes specifically says that Lytle is not, cannot establish clearly established law. And in fact, Judge Dennis, who wrote a dissenting opinion in that case with regard to no constitutional violation, admitted in his dissenting opinion that Lytle cannot create clearly established law because there's no Fourth Amendment violation. Thank you. Brazile v. Hagen is another case. That was a Supreme Court case in 2004 that we cited dealing with an officer that knocked on the window of a vehicle. There was a family disturbance that had started. Initially, the individual went to the vehicle, got inside. The officer knocked on the window. Hagen turned on the ignition and started accelerating. And the officer drew and shot the window of the vehicle because he was in imminent fear of death, serious bodily injury. And the Supreme Court granted qualified immunity on that as well. Real quickly, so the district court, if I'm recalling right, went through and found a number of genuine disputes of fact, which we can't review, right? Does that bar us from reversing here? In other words, can you, can you kind of crystallize how the, what the fact issues that the district court found, preventing summary judgment, how do we get around that? One, Your Honor, is with regard to the Monday morning quarterbacking of the shots four through nine. That's really what I'm going to, is four through nine. Those four through nine, you can't, the fact that in the opinion, the court says there are other alternatives that the officers could have used, that is, that is prohibited, that is prohibited analysis, Monday morning quarterback, not only in the Fifth Circuit, but in the U.S. Court of, United States Supreme Court. You can't Monday morning quarterback and say other alternatives. You need to just look at what actually happened. You're saying that's not really a fact issue the way a fact issue would be of whether somebody was a mile away or a foot away, which could be a fact issue. But there were other fact issues the district court articulated. Well, as opposed, for instance, on the second prong of the qualified immunity, she said that Lytle versus Bexar County clearly established law and that they were in violation of clearly established law, when in fact it doesn't. So the only case that she cited for the second court in Dawes versus City of Dallas and Harmon versus City of Arlington have specifically said do not apply to clearly established law. Well, that's prong two. I guess the fact issues the district court articulated would be prong one, right? As to the, no constitutional violation, whether or not there was or not. And then under the second prong that Lytle versus Bexar County cannot establish clearly established law. Well, I mean, the second prong can have fact issues because clearly established needs to be similar, not just, oh, you shot someone, so that is not qualified immunity. Well, we need a little more detail than that case by case. I think the key word in there is the robust consensus of persuasive authority. And there is no robust authority with regard to this particular scenario where an officer is granted qualified immunity for the first three shots and then a short seven seconds later, the other four through nine, there is no other case. The case that my colleague brought up is the Roque versus Bexar. You've used up your seconds unless one of us. I'm sorry. Okay. But you have saved time for rebuttal. Thank you. I know lawyers like to talk longer than seven seconds, so we will hear from Jeff Edwards on behalf of Estivas. May it please the court. I urge you to watch the video. We watched them. Well, I would also urge you to ponder this question. Is the court prepared to say that a seven second time period during which a threat ends, a car becomes immobile, and officers know it, and during that seven seconds, walk up towards the car and from 10 to 15 feet away, fire additional shots paralyzing a man? Some of the stuff you just said aren't facts. Some of them are conclusions, like the threat had ended. I mean, I watched the video. How can you say that the threat had ended? The threat stems from his use of a vehicle as a potential deadly weapon. He was still in the vehicle. He was still in the vehicle. He had just reversed it into a police car and then gone forward with it. How had the threat ended? The threat had ended because the car had become incapacitated. The threat, the car had stopped. The car was immobile and stuck in the grass during this seven second period during which the court found that the officers had a reasonable amount of time to determine that. But the problem is that a reasonable amount of time, saying that it is seven seconds, I just used the seven seconds and I'm not even done asking. So how, I mean, if it was seven minutes, I could see that, but the problem is you've got this and this and this going on and you're like, and that's even, that's seven seconds. I mean, so the problem is how is that too much time? Well the law is clear. In Roque v. Harville, this court said at some point the rope of reasonableness ends. And in that case, you were talking about a two second delay in which an individual turned with a gun, officer shot, causing him to drop the gun. The officers did not believe he dropped the gun, but it was on video and you could be seen that it wasn't in his hand. And during those, and the court held the first shot, qualified immunity is one's entitled to it, but not for shots two and three. Now here again, I come back to the car is, is the alleged deadly weapon. Now leaving aside whether he bumped, slammed, again, the court found, look, right after he bumps the car and starts, starts to go away, perhaps that's a split second determination. The law is not, uh, courts have to make account for officers seven to 10 second decisions. The court is a split second. There is a fundamental difference between a split second and seven seconds. Again, officers are trained to handle exactly these situations. There, again, in Lytle, which the court found clearly established that once a car is driving away from an officer, the threat is, has ended. You may not use deadly force. That's the problem. It wasn't driving away from the officers. It was pinned into the berm and the fence and the wheels were spinning and there was a cloud of dust where it was revving. Well, the revving and the spinning had stopped and your honor asked a, asked a, I think an important question. Didn't the officers concede that if the, if that had stopped, then the shooting was unreasonable and they did. And if I can find that in my notes, I'll read you the exact question and you're correct. Judge Justice Haynes, there was an if before that, but can to officers can to and Guajardo both admitted that it would have been unreasonable to shoot Mr. Estevez if the truck had stopped. As a factual matter, the truck had stopped. The video shows that the truck had stopped. The video shows that the wheels had stopped spinning. Here is the question. If in this scenario you shot at the vehicle while it is stopped, then that would be unreasonable, correct? Correct. The same question was posed to officer Guajardo. If you shot at Mr. Estevez after his vehicle was stopped, that would be unreasonable, correct? Answer. Yes. I mean, this isn't a close call. I appreciate that people who have different perspectives on life can view videos in slightly different ways. It's not different perspectives on life. It's, I have two eyeballs and I looked at the video. My perspective on life has nothing to do with it. It's, you watch the video. They have videos of, these days, these cases, they have videos from five different angles and we watch the videos. So, that just is what it is. And there's a, the wheels are revving, the engine is revving, the wheels are spinning, there's a cloud of dust in the air. But the wheels are not spinning and the engine is not revving during shots four, five, six, seven, eight, and nine. Tell me. Your Honor, I have eyeballs as well. Well, here's something we'll get away with in the eyeballs. Put my eyeballs on the case that says if they shoot within two seconds of the wheels stopping or one second of the wheels stopping within a seven second interval, whenever that happened, where's your case that clearly establishes that what they did was unreasonable such that every officer would know what you're doing violates the Constitution? And I think, I think that goes to the crux of the question. Where's your case? Well, my, my case is that Lytle makes it clear that when a car is going away from the officers, here, during this test. Where's your case, though, that the exact scenario here, that all our eyeballs can see because it's on video, where the wheels stop spinning at some point, but a second or two goes by and the officers have suddenly crossed into a constitutional violation? Sir, I do not have a case that, that holds that when wheels stop spinning. But there are cases. What's your best case that clearly establishes here the constitutional violation they committed? No, I mean, I think that it, I think that Lytle is the best case. And, and Lytle, Lytle held that if the facts were, as the plaintiff alleged, that the car was moving away, that there was only a three to ten second period, and that then, then the threat had ended. Here, objectively, the threat had ended. Edwards v. Oliver, which is decided after this case, relied on Lytle and directly held that once the car is moving away from the officer, then the threat is over, and then deadly force is no longer permissible. Excuse me. There is no case about spinning wheels, but it is, it's kind of misconstruing the facts as to whether or not the key is whether the wheels were spinning. The key is whether the car had stopped moving such that it stopped being a threat. And the case law from Garner to Graham on down hold that once an individual is no longer a threat, it is not reasonable to use deadly force on them. You simply go through the. Maybe he had stopped, but then he backed up to hit them. No, no. I'm not talking about during the ten seconds, but I'm just talking in general. Then a car can stop and go again. Maybe not this one if it was, you know, damaged, but I'm just saying that is, actually they had damaged it along the road and he was still going. He just wasn't able to go 100 miles an hour anymore. He was going three to five miles an hour. Yeah, but they had damaged the car and it was still able to go. So that suggests that just because you think, huh, the car might swirl back at you, right? I'm not, I'm not suggesting that I'm claiming it's impossible that the car could start again and move again, I suppose. But the fact of the matter was it hadn't. It was stuck in the grass. And again, the police had knew that the car had been incapacitated and knew that from that point forward, once the wheels had been deflated or the victim of the spikes, it backed up and crashed into a cop car after it had been incapacitated. In other words, the thing was moving for some period of time, minutes and hours after the spikes and all that. So how, when did, when in this time span we're talking about the 10 seconds, 15 seconds, 20 seconds, when did they know the vehicle was incapacitated? When did they know the vehicle? Yes. Having backed up and reversed and pulled forward again just seconds before, when, when was the moment of incapacitation there? And I'm sorry, I feel like I interrupted. No, that's okay. Um, I, they're really, they're really two, two questions in there. One is during the 10 second period. When would a reasonable, when would a reasonable officer know that the car was incapacitated? And I don't know that they need to know that it's incapacitated. They simply need to know that it's stopped because when it's not moving, it is not an active threat. If it started again and went towards an officer, the law is clear. If you're going in the path of an officer with a vehicle, that is an act of potential imminent risk. But if you're going away from an officer, the converse is true. You are not an imminent risk. So by extension, it follows that when the car is stopped, you're not an imminent risk. That's no different than if a gun is on the ground, you could grab it, but it's very different than being in your hand. It was stuck in the grass. Again, the issue isn't did these officers in a matter of two, three seconds understand the full import of it being mired in the grass. But I come back to the second part of, of your question about incapacitation. And when I'm using the word incapacitation, I don't necessarily mean the truck, the truck could not move. Okay. But it had been stopped from being able to move at speeds greater than five to 10 miles an hour. Now by, by eliminating the ability to move faster than five to 10 miles an hour, you eliminate most of the danger that comes from, from a driving a vehicle, even this, even this truck. And that's why it's significant that the officers knew before they performed what was described as an illegal maneuver on the truck, they knew that this truck was not the same type of risk. So that's why this case is significant. Once it's stopped, it's simply objectively not a risk. Now, could it become a risk again? Perhaps, but that's not the facts here. And that's not what the video shows. And one of the key factual disputes, which goes to whether or not this court has jurisdiction, is the officers contended that the wheels were spinning and that the car was moving. That was the reason that they shot. That, that, that object, that the court found there was a material issue of fact, a disputed fact on that matter. I'm curious, genuinely curious about this, because it comes up more and more in these video cases. If the video shows what's happening, sure. If the video shows what's happening, how can there ever be a fact dispute when I can lay eyes on it? It's like right there. How can there be a fact dispute if I got a video? Again, you, you posit a very good question, and the video is crystal clear. There, there really shouldn't be. However, however, I mean, you're talking about officers' perceptions. Their perception was that the car was moving, and it, it, it was not. And again, that's, that was their testimony, that the car was moving. Their testimony was that Mr. Estevez, our client, the person who was paralyzed, he ran into the police officer rather than the police officer running us, us off the road. Back to one of the other important fact issues, because it goes to knowledge of potential harm. There, there is a fact issue as to whether or not the officers knew about any prior assaults by Mr. Estevez. Why is that significant? Okay. That goes to whether or not Mr. Estevez may be a risk when the car is mired in the mud. Okay. Again, the police do not have open season to fire simply because you go on a police chase. Mr. Estevez was despondent. He shouldn't have done this. But you look at this, this is a two-hour chase, which fundamentally changed about an hour and 40 minutes in. It went from a high-speed chase, which is very dangerous, to a very low-speed chase, which is not dangerous. It's not legal, it's not proper, but it's not dangerous. Okay. And I appreciate that, that I don't have a case that directly holds that an officer who waits seven seconds knowing someone is immobile, unarmed in a car, can't be shot and killed. That's, so that's not the law. The law, as everybody knows, the law is not that you need a case that's directly on point. You need a case that is on point enough to give the officers notice that what they are doing is clearly unreasonable. So that's, so let's not do the straw man thing where you have to have a case about wheel spinning. You don't have to have that case. And that's why, earlier we said, as I heard you say, Slidle is the best case. Well, Lidle is the best case. I mean, and again, Judge Duncan, I completely agree that the issue here is did the officers have reasonably fair warning that what they did was not reasonable. And I think one of the best indications that they had reasonably fair warning that what they did was unreasonable is that they testified that that exact situation would be unreasonable. But the cases seem to come down, the car cases, I'll call them, seem to come down in terms of providing fair warning to officers that if the vehicle is headed in your path or the path of another person, then that may pose an imminent risk. And in those situations, we don't think it's fair to hold officers. We give them the benefit of the doubt in those situations. However, the law is equally clear that when the vehicle is moving away from an officer, not in the path of someone, that in those situations, officers have fair warning that it's not permissible to shoot. One can look at the Baker case. One can look at the Edwards v. Oliver case. And this notion that if the first shot is acceptable, or not necessarily acceptable because I would bite your tooth and nail on that despite everything, but if qualified immunity is applicable to a first shot, it is not true that an officer gets to continue shooting. There is a case directly on point about that, that's Roque v. Harville, an opinion from Judge Willett, that directly addresses that. That says, look, the first shot, fine, but the next one and the next one. Now, there is no evidence here that Mr. Esteves, who was personally incapacitated in the way that Mr. Roque became incapacitated. But there is evidence, when viewed in the light most favorable to the plaintiffs, that the car was immobile. Or not, and really, just simply not a threat. It was at best going three to five miles an hour, even if it got away. It was boxed in. And all these officers had to do was simply say, sir, get out of the car. And I don't say that because, and it's not different perspectives. All I meant by that is that when people view videos, sometimes everyone doesn't see the exact same thing, despite the fact that it's there on video. Objectively, the wheels had stopped spinning. That's just a fact. Objectively, these officers had eight seconds to decide not to shoot. And why do I believe that that is truly important in this case? It is because the law from the Supreme Court is that we have to be careful not to use hindsight to money morning quarterback split second decisions. Now, I don't believe seven seconds, eight seconds is a split second. And while I appreciate that, you know, a nervous orator, you know, stumbles for eight seconds regularly. And I confess, I'm one of those. Eight seconds is a long time. Well, then maybe we should only have oral arguments for eight seconds. Perhaps. If I'm not doing a good job, maybe that's better. But lawyers think 20 minutes is pretty short. So I'm not really sure any of them would say, ah, eight seconds is too long. Well, again, I don't think I don't. Well, perhaps, perhaps I was in our full and even beginning to compare oratory inside this chamber to to to the seven seconds. You know, I've been done answering me. Well, again, the decision to take a human life requires some thought. It does not take seven seconds. I certainly agree with you. I mean, your view is the that that that taking him life is is a big deal. I mean, the the the Monday morning quarterbacking thing that makes me uncomfortable is when we start sort of positing, well, the officer should have done this. The officer should have done that. The officer could have done this. The officer could have done that. It's like, well, yeah, but I wasn't there and I could see what happened on video. I wasn't there. So, like, you think the officer should have just just waited. Well, that's that's what the court held. The court held that there was sufficient time for the officers to to to do other things. And of course, the officer should have just waited. That's just textbook police work. This isn't a decision where there was any threat to them. The threat was over. He didn't have a gun. He didn't have the potential to harm them. They were 10 to 15 feet away. They were further away than I am from you. And all they had to do was simply say, sir, get out of the car. Instead, they opened, fired and killed or not killed him, paralyzed him. I mean, despite the fact that they had just engaged in what a two hour chase where he had every opportunity to stop or not keep going, not keep going, not keep going. And then when they finally boxed him in, he reverses and slams into a police car. Well, when you say I would think the police at that point can there's he's not going to stop. This is never going to stop. You know, but man. Yeah. If the court truly believes that it's reasonable for a police officer, um, to to continue shooting someone after they have objectively not become a threat, then I respectfully disagree. And I and I think the I think the standard is disagree with that statement to what way you just put it. I disagree that I don't think officers have the right to shoot somebody after he's objectively stopped being a threat. And our cases hold that the question is, how does that apply in this particular? Well, when a when a car has stopped and is immobile and cannot be used as a threatening weapon, it has stopped being a threat. And over a period of seven seconds, these officers had the opportunity to discern that. And I appreciate that my characterization of of what happened here is something that I believe you said you agreed is wrong. We're at summary judgment, and I would respectfully ask the court. Can you look at that video and see officers approaching a vehicle and rather than saying, Get out of the car or, Sir, now or giving even a warning, they fired. And that is the textbook obvious case of not being able to shoot someone who is not immediately or imminently a threat of deadly harm to an officer or someone else. And I thank you for letting me go. Thank you. All right. And we'll now hear the rebuttal. Yes, Your Honor. May it please the court. Our position is that Mr. Estevez was a continual threat to both officers, Contu and Lajardo, and he never ceased being a threat. In fact, afterwards, the video video is Council. Mr. Edwards says, If I look at the video again, which I will, then I'll see the wheels stop spinning. OK, maybe. What happens then? I kind of I missed that. I'm sorry. I'm sorry. I mumble. My wife tells me that a lot. What if Mr. Edwards says, Look at the video again and you'll see the wheels stop spinning? OK, I will. We all will. What then? What if what if in fact the wheels stop spinning? So therefore he was no longer a threat. What's your response to that? That he still is a threat because, one, the engine's on. And two, we don't know if even though he may not during the last two seconds, the engine may not have been revving, so to speak. That doesn't mean he couldn't subsequently rev it again, as they did in the Ninth Circuit case that we cited. You don't have to wait to see if it ever catches traction and starts going again because the suspect had been cornered. You don't. And what caused them to stop shooting? In their mind, that's when they they stopped shooting. They backed up. And that's what I was going to mention. They still had shields before they approached the vehicle. So they they continued to think he was a threat, but they just stopped shooting. But when they approached the vehicle, they put ballistic shields. So they did conclude, OK, it's time to stop shooting. It's just not after the ninth shot that the district court thought they should have or arguably should have. Right. Within those seven seconds. And under Plumhoff, once you have the right to shoot and it's qualified immunity for the first three, you have the right to continue shooting. They did in Plumhoff 15 shots until the officer reasonably believes the threat has stopped. Just because the car stopped does not necessarily mean the threat had stopped. What about the opinion, Mr. Edwards talked about the opinion in Roque versus Harville from Judge Willett. Could you address that? Yes, Your Honor. That one, it doesn't involve a vehicle. It involves an individual who had some mental issues. He did have, I think, was a weapon. The body worn camera shows that he was shot. Those shots were held to be qualified immunity. And the body worn camera shows the gun being dropped. And then the individual wanders off to the curb. And that's when the officer continued to shoot while he was off. And the video in that case, Judge Willett said, well, you can see that the gun had dropped. So therefore, he didn't have pose a threat anymore with regard to the third and fourth shot. I think what's telling in this case is that at the record on 902 and 903, you know, the question was given to, because the municipality was also, they had been dismissed from the case, the city of Laredo. But the chief of police was testified in the case. And he reviewed the video along with his command staff. So the question was, so your point is that he's still trying to get away or he appears to be trying to get away based on the engine revving. Answer by Chief Trevino, yes. And the smoke and the tire spinning. And that's what I'm saying. It's such a tight kind of window, like within a second, the impact, then veering to the right, engine veering, smoke happening. You see, he was trying to flee and potentially or put the officers in danger of being hit by the car and was attempting to get out of the way, to get out of the situation, where it was obvious that revving up his engine and spinning his tires trying to get out was his intent. Again, the officers had to make a decision with split seconds to spare. In my opinion, the shooting was justified. That's what we determined. And that's from the chief of police of the city of Laredo as well as another reasonable officer. I would submit our expert, Albert Rodriguez, who testified and who's a former commander of the Texas Department of Public Safety, who testified that in his opinion it was reasonable. So if reasonable people can, that's the test under the reasonable, if reasonable officers can disagree, then the officers are entitled to qualified immunity. We would ask this Court to reverse the trial court's denial of motion for qualified immunity and give judgment to Officers Guajardo and Cantu, Your Honors. Thank you very much. Okay. Thank you. We appreciate both sides' arguments and we appreciate all the arguments today. We have now concluded today and for this week of this panel. Thank you very much. All rise. We're adjourned.